UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   :
                                                                 :
NATURAL RESOURCES DEFENSE                                        :
COUNCIL, INC.,                                                   :
                                                                 :
                              Plaintiff,                         :        18cv613
                                                                 :
                 -against-                                       :        OPINION & ORDER
                                                                 :
ANDREW WHEELER, in his official                                 :
capacity as Administrator of the United States                  :
Environmental Protection Agency,                                :
                                                                 :
                              Defendant.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   :

WILLIAM H. PAULEY III, Senior United States District Judge:

          The Natural Resources Defense Council, Inc. (the "NRDC") brings claims under

the Administrative Procedure Act (the "APA") to challenge the issuance of a directive by the

Administrator of the U.S. Environmental Protection Agency (the "EPA"), which purportedly

purges the EPA's advisory committees of scientists from academic and non-profit backgrounds

in favor of those from industries the EPA regulates (the "Directive").  The EPA moves, as a

threshold matter, to dismiss the NRDC's claims on jurisdictional grounds under Rule 12(b)(1) of

the Federal Rules of Civil Procedure.  Both parties also move for summary judgment under Rule

56 on the merits of the NRDC's claims.  Various states and former EPA personnel have

submitted amicus curiae briefs in support of the NRDC's position.

          The implications of the Directive are potentially far reaching, and similar

challenges have reached at least two other federal courts.  Whatever the merits of these

challenges, however, this Court's determination is narrow—only that this plaintiff has not

demonstrated that it is the proper party to challenge the agency action.  The NRDC's lack of

Article III standing to bring this action compels the dismissal of its claims without prejudice. Therefore, the EPA's motion to dismiss is granted, and the parties' dueling motions for summary judgment are denied as moot.

<u>BACKGROUND</u>

On October 31, 2017, Scott Pruitt—then the Administrator of the EPA—issued the Directive and an accompanying memorandum regarding the eligibility of individuals to receive competitive research grants from the EPA and to serve on the EPA's nearly two-dozen federal advisory committees (the "Memorandum").[1]  These advisory committees provide expert and technical advice as well as recommendations to the EPA.  At its core, the challenged portion of the Directive prevents those who have received an EPA research grant from simultaneously serving on an advisory committee.  According to the NRDC, the Directive—under the guise of promoting independence and removing financial conflicts of interest—functionally targets qualified scientists from academic, non-profit, and other independent institutions.  The NRDC claims that the Directive in effect serves as a pretext to skew representation on the advisory committees in favor of individuals employed or funded by industries that the EPA regulates.

I.      <u>Statutory and Regulatory Framework</u>

Federal advisory committees are bodies established by Congress, the President, or federal agency heads to provide expert advice and recommendations on various issues.  As relevant here, the EPA relies on approximately two dozen such committees to advise on a broad range of environmental issues and provide peer review of the science it uses.  (Amended Complaint, ECF No. 13 ("Compl."), ¶¶ 2-3, 21-22.)

---

[1]      Following Pruitt's resignation, then–Acting Administrator Andrew Wheeler was automatically substituted as the defendant pursuant to Rule 25.  <u>See</u> Fed. R. Civ. P. 25(d).  The Senate confirmed Wheeler as Administrator on February 28, 2019.

The Federal Advisory Committee Act of 1972 ("FACA") governs the establishment, management, oversight, and operation of federal advisory committees.  See 5 U.S.C. App. § 1 et seq.; accord 41 C.F.R. § 102-3.10.  Under FACA and implementing regulations promulgated by the General Services Administration, the membership of advisory committees must be "fairly balanced in terms of the points of view represented and the functions to be performed" by the committee.  5 U.S.C. App. § 5(b)(2); accord 41 C.F.R. § 102-3.30(c).  Though neither the statutory nor regulatory provisions flesh out the contours of what it means to be "fairly balanced," regulatory guidance clarifies that the composition of an advisory committee will depend on factors such as the following:

> (i) The advisory committee's mission; (ii) The geographic, ethnic, social, economic, or scientific impact of the advisory committee's recommendations; (iii) The types of specific perspectives required, for example, such as those of consumers, technical experts, the public at-large, academia, business, or other sectors; (iv) The need to obtain divergent points of view on the issues before the advisory committee; and (v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations.

41 C.F.R. part 102-3 subpart B App'x.  In addition, the advice and recommendations of the committee must not be "inappropriately influenced by the appointing authority or by any special interest."  5 U.S.C. App. § 5(b)(3); see 41 C.F.R. § 102-3.105 (requiring each agency head to develop procedures to this end).

FACA does not specify the manner in which advisory committee members should be appointed.  Its implementing regulations provide only that advisory committee members "serve at the pleasure of," and membership terms remain "at the sole discretion of," the appointing authority, unless "otherwise provided by statute, Presidential directive, or other establishment authority."  41 C.F.R. § 102-3.130(a); accord 41 C.F.R. part 102-3 subpart C App'x (observing that each agency head "may specify those policies and procedures, consistent with the Act and this part, or other specific authorizing statute, governing the appointment" of

3

advisory committee members).  Similarly, FACA and its implementing regulations do not set forth any specific membership or eligibility requirements.

On the other hand, the statutes that establish some of the EPA advisory committees set forth membership requirements in varying degrees of granularity.  See, e.g., 42 U.S.C. § 4365(b) (requiring members of the Science Advisory Board to be "qualified by education, training, and experience to evaluate scientific and technical information on matters referred to the Board"); 42 U.S.C. § 7409(d)(2)(A) (mandating that the Clean Air Scientific Advisory Council be "composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies"); 7 U.S.C. § 136w(d)(1) (requiring the Federal Insecticide, Fungicide, and Rodenticide Act Science Advisory Panel to "consist of 7 members appointed by the [EPA] Administrator from a list of 12 nominees, 6 nominated by the National Institutes of Health and 6 by the National Science Foundation," to be "selected on the basis of their professional qualifications to assess the effects of the impact of pesticides on health and the environment"); 15 U.S.C. § 2625(o)(3) (providing that the Science Advisory Committee on Chemicals must be "composed of representatives of such science, government, labor, public health, public interest, animal protection, industry, and other groups as the [EPA] Administrator deems to be advisable, including representatives that have specific scientific experience in the relationship of chemical exposures to women, children, and other potentially exposed or susceptible subpopulations").

II.     The Directive

In broad strokes, the Directive—which neither party disputes was issued without notice and comment—proclaimed four new principles for the EPA to apply in establishing the membership of its advisory committees.  These principles are aimed toward "strengthen[ing] and

improv[ing] the independence, diversity and breadth of participation on EPA federal advisory committees." (Compl., Ex. A (the "Directive").) As relevant here, NRDC challenges the portion of the Directive that purports to prohibit simultaneous receipt of EPA grants and service on advisory committees.[2] That portion provides as follows:

> 1. *Strengthen Member Independence:* Members shall be independent from EPA, which shall include a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant. This principle shall not apply to state, tribal or local government agency recipients of EPA grants.

(Directive.)

In addition to this mandatory principle, the Directive also articulates three aspirational principles—namely, that "committee balance should reflect prominent participation from state, tribal and local government," that "membership should be balanced with individuals from different states and EPA regions" (especially historically unrepresented or underrepresented ones), and that "membership should be rotated regularly." Finally, the Directive contains two disclaimers. First, it states that it "is intended to improve the internal management of EPA" and disavows the creation of any "right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, EPA, its officers or employees, or any other person." Second, the Directive reserves to the EPA administrator the discretion to depart from the principles it announces.

The Memorandum purports to explain the principles underlying the Directive. (Compl., Ex. B ("Memorandum"), at 2.) As relevant to the challenged portion of the Directive, its prefatory language reaffirms FACA's "fair balance" requirement, the importance of qualified

---

[2]   The EPA selects grant recipients through a competitive, peer-reviewed process—it cannot pre-select the recipient or direct the conclusions that the research must support. (Compl. ¶¶ 4, 26-30.)

candidates, and the need for candidates to be "independent from the Agency," to "avoid any conflicts of interest within the scope of their review," and to be "fully committed to objectively serving the Agency and public."  (Memorandum, at 2.)  This language also explains that the other three principles, which generally seek to broaden the diversity of advisory committee composition, are grounded in "cooperative federalism and recognition of the unique experience of state, tribal and local government officials."  (Memorandum, at 2.)

More specifically, the Memorandum states that advisory committee members "should avoid financial entanglements with EPA to the greatest extent possible," and that "[n]on-governmental and non-tribal members in direct receipt of EPA grants while serving on an EPA [advisory committee] can create the appearance or reality of potential interference with their ability to independently and objectively serve as [an advisory committee] member." (Memorandum, at 3.)  Consequently, it reiterates that "in addition to EPA's existing policies and legal requirements preventing conflicts of interest among the membership of the Agency's [advisory committees]," EPA advisory committee members may not "currently receive EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant."  (Memorandum, at 3.)

III.    The NRDC's Claims

Following the issuance of the Directive, qualified scientists employed by academic and non-profit research institutions were removed from EPA advisory committees. (Compl. ¶¶ 1, 7, 46.)  According to the NRDC, they were replaced by many individuals who are employed or funded by the industries the EPA is responsible for regulating.  (Compl. ¶¶ 1, 7, 36, 47.)  For instance, as the NRDC alleges, 30 of 44 members of the Science Advisory Board are now affiliated with regulated industries.  (Compl. ¶ 47.)

The Complaint asserts three APA claims.  First, the NRDC asserts that the EPA's issuance of the Directive was arbitrary and capricious because the agency does not explain (1) how the Directive comports with FACA's requirements that advisory committees be "fairly balanced" and not "inappropriately influenced" by special interests; (2) how it complies with statutory requirements that advisory committees have members with relevant scientific expertise; (3) why it exempts state, local, and tribal grantees; (4) how it squares with federal conflict-of-interest regulations; or (5) why the receipt of EPA grants would create a conflict of interest. Second, the NRDC claims that the Directive's issuance was arbitrary and capricious because the EPA did not explain the reasons for reversing its prior position that advisory committee members could simultaneously receive EPA grants.  Relatedly, the NRDC faults the EPA for failing to explain why it disregarded the factual determinations underlying that position.  Third, as a procedural matter, the NRDC avers that the EPA flouted the APA's notice-and-comment requirements.

## DISCUSSION

Under Rule 12(b)(1), a case is "properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving a Rule 12(b)(1) motion, "the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016).  The EPA contends that this Court lacks both the constitutional and statutory authority to adjudicate this case for three primary reasons.  First, it attacks the NRDC's Article III standing to assert the claims in the Complaint.  Second, the EPA seeks to dismiss this lawsuit based on prudential ripeness concerns.  Third, it maintains that the NRDC's

claims are not reviewable under the APA because the Directive does not constitute final agency action, and also because no meaningful standards of review apply to the challenged agency action.

Here, this Court concludes that the NRDC lacks Article III standing.  See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 484 (1982) (reaffirming that standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated" (citation omitted)). Accordingly, this Court may not entertain the Directive's reviewability under the APA or the merits of the NRDC's claims.

I.      Legal Principles

Article III of the U.S. Constitution limits the federal judicial power to cases and controversies.  Clapper v. Amnesty Int'l, USA, 568 U.S. 398, 408 (2013).  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  Clapper, 568 U.S. at 408 (citations omitted).  Standing focuses on "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016) (citation and quotation mark omitted). To establish standing, a plaintiff must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  A plaintiff must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) (citation omitted); accord Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon, 775 F.3d 154, 159 (2d Cir.

2014) (explaining that the standing doctrine "requires every federal plaintiff to establish, 'for each claim he seeks to press,' a personal injury that is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief" (internal citations omitted)).

As a threshold matter, an organization such as the NRDC may have Article III standing in two ways.  First, to sue on behalf of its members—that is, to have "associational" or "representative" standing—an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  While the organization need not identify any member with standing in his or her own right by name, it must nevertheless establish that "at least one identified member ha[s] suffered or would suffer harm."  New York v. U.S. Dep't of Commerce, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) (emphasis in original) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009)).  Second, to "have standing in its own right to seek judicial relief from injury to itself," Warth v. Seldin, 422 U.S. 490, 511 (1975), the organization must independently satisfy the same Article III standing inquiry that applies to individuals, N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012).  At issue is whether the NRDC has sufficiently alleged a cognizable injury in fact, either to itself or its members.

II.     Matters Considered

When a defendant challenges standing at the pleading stage by a Rule 12(b)(1) motion, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss[, courts] presum[e] that general allegations embrace those specific

facts that are necessary to support the claim." Lujan, 504 U.S. at 561 (quotation marks omitted).

A Rule 12(b)(1) challenge "may be either facial or fact-based." Carter, 822 F.3d at 56.  In

contrast to a fact-based challenge, in which the defendant "proffer[s] evidence beyond the

[complaint and attached exhibits]," a facial challenge—as here—is "based solely on the

allegations of the complaint" and attached exhibits.  Carter, 822 F.3d at 56-57.

       A plaintiff has no evidentiary burden on a facial challenge, and the court

determines only whether the complaint alleges facts that, accepted as true and construed in

plaintiff's favor, "affirmatively and plausibly suggest" it has standing.  Carter, 822 F.3d at 56-57;

see Warth, 422 U.S. at 501; Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).

Although NRDC has no evidentiary burden, it submits declarations from its staff and members.

This Court considers those declarations to the extent they are not conclusory or hearsay, J.S. *ex*

*rel.* N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004), and to the extent they bear on

the jurisdictional question, see Thompson v. Cty. of Franklin, 15 F.3d 245, 249 (2d Cir. 1994)

(noting judicial discretion in allowing "further particularized allegations deemed supportive of

plaintiff's standing" through affidavits).

III.    Injury in Fact

       "To establish injury in fact, a plaintiff must show that he or she suffered an

invasion of a legally protected interest that is concrete and particularized and actual or imminent,

not conjectural or hypothetical." Spokeo, Inc., 136 S. Ct. at 1548 (citations and quotation marks

omitted).  These terms "cannot be defined so as to make application of the constitutional

standing requirement a mechanical exercise." Fulani v. Bentsen, 35 F.3d 49, 52 (2d Cir. 1994)

(citation and quotation marks omitted).  In other words, the Supreme Court instructs that courts

should "'compar[e] the allegations of the particular complaint to those made in prior standing

cases,' while keeping in mind the important role that the doctrine of separation of powers plays in limiting the scope of judicial authority."  Fulani, 35 F.3d at 52 (quoting Allen v. Wright, 468 U.S. 737, 751-52 (1984)).

The NRDC alleges four distinct injuries to itself or its members.  First, it alleges that the Directive directly injures its organizational objective of ensuring that science is used to inform the regulatory process by skewing advisory committee membership in favor of regulated industries.  (Compl. ¶ 50.)  Second, the NRDC avers that the Directive disparages its members' professional reputations by hinting that they are unable to serve independently and objectively.  (Compl. ¶ 49.)  Third, it claims that the Directive limits its members' professional opportunities by denying EPA grantees the opportunity to join an advisory committee and advisory committee members the opportunity to receive EPA grants.  (Compl. ¶ 48.)  Finally, the NRDC asserts process injuries both to itself and its members based on the issuance of the Directive without providing notice or an opportunity to comment.[3]  (Compl. ¶ 51.)

A.  Organizational Activities

In this circuit, "only a 'perceptible impairment' of an organization's activities [as a result of a defendant's actions] is necessary for there to be an 'injury in fact'" to the organization.  Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 110 (2d Cir. 2017) (summarizing Second Circuit precedent); see also Citizens for Responsibility & Ethics in Wash. v. Trump ("CREW"), 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017).  Consequently, an organization's depletion or diversion of resources—no matter how

---

[3]       This alleged injury need not detain this Court long.  The NRDC asserts that the injury itself is the deprivation of the opportunity to comment on the Directive.  "[I]n the absence of a connection between a procedural violation and a concrete interest, a bare violation of the former does not manifest injury in fact."  Strubel v. Comenity Bank, 842 F.3d 181, 189 (2d Cir. 2016).  Where a bare procedural violation is at issue, the "central inquiry . . . is whether the particular . . . violation may present a material risk of harm to the underlying concrete interest Congress sought to protect."  Crupar-Weinmann v. Paris Baguette Am. Inc., 861 F.3d 76, 80-81 (2d Cir. 2017).  The NRDC does not address this theory in its motion papers.

scant—from other activities to counteract the effects of defendant's practices or policies suffices. CREW, 276 F. Supp. 3d at 190 (collecting cases); see also Nnebe v. Davis, 644 F.3d 147, 157 (2d Cir. 2011) ("[S]o long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference]'" (citation omitted) (alteration in original)).  By contrast, "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by [Article III]."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 (1976).  In other words, an organization must show "concrete and demonstrable injury to the organization's activities," as opposed to a mere "setback to the organization's abstract social interests."  Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).

The NRDC is a national, non-profit organization that engages in "research, policy analysis, communications, legislative work, and litigation to protect public health and the environment."  (Compl. ¶ 11; Declaration of Dr. Christina Swanson, ECF No. 38 ("Swanson Decl."), ¶ 4.)  Its stated mission "includes ensuring that federal regulatory initiatives are informed by the best available scientific research."  (Compl. ¶ 11.)  To that end, it "maintains a Science Center which is staffed by experts in environmental science and public health, operates a Science Fellows program for postdoctoral scientists, and provides guidance and resources for research and collaboration with other scientists and partners."  (Compl. ¶ 11.)  The NRDC claims that the Directive harms its objective of ensuring scientific integrity in the EPA's regulatory processes.  (Compl. ¶ 50; see Declaration of Gina Trujillo, ECF No. 37 ("Trujillo Decl."), ¶ 7.)

However, the NRDC does not allege—either in the Complaint or the declarations submitted by its Director of Membership and its Science Center Director—that it diverted any

other resources from its activities (specific or otherwise) because of the Directive.  See Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993) (citing to testimony by organizational representative as to substantial resources expended in counteracting the effects of defendants' actions).  And while the NRDC has no doubt expended resources in this litigation, such an expenditure cannot itself—without any indication of diversion from the NRDC's core activities—suffice to give rise to a constitutional injury, lest "any litigant . . . create injury in fact by bringing a case, and Article III . . . present no real limitation."  See Spann v. Colonial Vill., Inc., 899 F.2d 24, 27 (D.C. Cir. 1990); accord U.S. Dep't of Commerce, 351 F. Supp. 3d at 615-16; Lowell v. Lyft, Inc., 352 F. Supp. 3d 248, 258 (S.D.N.Y. 2018).  Moreover, it is not evident how the NRDC's ability to pursue its advocacy and litigation activities would be impaired by the Directive—if anything, the filing of this action appears to be squarely within the NRDC's core activities.  On balance, the NRDC's objective of ensuring scientific integrity, which the Directive allegedly harms, is no more than an "abstract concern with a subject that could be affected by an adjudication [that] does not substitute for the concrete injury required by [Article III]," Simon, 426 U.S. at 39, irrespective of the "intensity of the [NRDC's] interest or the fervor of [its] advocacy," Valley Forge Christian Coll., 454 U.S. at 464.

Finally, the NRDC contends that its interest in ensuring that advisory committees perform their roles based on valid scientific principles is impaired by the Directive's removal of the most qualified scientists from advisory committees and skewing their balance in favor of regulated industries.  It bolsters this contention with decisions by two sister courts of appeals purportedly recognizing that a violation of FACA may confer a constitutional injury on those affected by an advisory committee's work.  But the NRDC reads too much into those decisions.  Those cases do not stand for the proposition that violations of FACA's "fair balance"

requirement injure any person with an abstract interest in or who may be affected by the work of advisory committees in general—instead, they explain that a cognizable injury may lie for those with a direct interest in or who are themselves directly affected by a specific advisory committee's work.[4]  See Cargill, Inc. v. United States, 173 F.3d 323, 328-30 (5th Cir. 1999) (finding that plaintiff organizations had standing to challenge the formation of an advisory committee that peer-reviewed a study of mines operated by its members, which "have a compelling interest in ensuring that the study's results are accurate"); Nat'l Anti-Hunger Coal. v. Exec. Comm. of the President's Private Sector Survey on Cost Control, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983) (clarifying based on legislative history that "the 'fairly balanced' requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee").

　　B.  Reputational Injury

　　　　The Supreme Court has "long recognized that an injury to reputation will satisfy the injury element of standing." Gully v. Nat'l Credit Union Admin. Bd., 341 F.3d 155, 161 (2d Cir. 2003).  Nonetheless, such an injury must be "concrete and particularized" and "actual or imminent," and not "conjectural or hypothetical."  Spokeo, Inc., 136 S. Ct. at 1548.  Thus, the cases finding a cognizable injury based on reputational harm have involved governmental action that results in direct reputational harm to specific plaintiffs.  E.g., Foretich v. United States, 351 F.3d 1198, 1213 (D.C. Cir. 2013) (statute challenged as bill of attainder that "effectively brand[ed] [Foretich] a child abuser and an unfit parent"); McBryde v. Comm'n to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S., 264 F.3d 52, 57 (D.C. Cir. 2001) (Judicial Council's public and official characterization of district judge as

---

[4]　　And on this score, it bears mentioning that the NRDC's claims fundamentally challenge the eligibility of certain individuals for advisory committees, as opposed to the composition of any particular advisory committee.

having "engaged for a number of years in a pattern of abusive behavior"); Rangel v. Boehner, 20

F. Supp. 3d 148, 160 (D.D.C. 2013) (censure of House member recorded in permanent House

records).  By contrast, the Directive at most suggests that non-tribal, non-governmental EPA

grantees as a general category may be biased or lack objectivity in their service on advisory

committees.  Cf. ACORN v. United States, 618 F.3d 125, 131 (2d Cir. 2010) (reasoning that

plaintiffs had standing to sue a government agency "constrained to enforce" a congressional

appropriations law that specifically barred ACORN and its affiliates from receiving the

appropriated funds).

       Moreover, although the NRDC proffers declarations from two members—

William H. Schlesinger and Dr. Emma J. Rosi-Marshall—reaffirming in conclusory terms their

belief that the Directive harms their reputation by intimating bias or lack of objectivity, they do

not allege with any additional specificity what sort of actual, tangible harm to their reputations

they have suffered or will suffer.  See Floyd v. City of N.Y., 302 F.R.D. 69, 119 (S.D.N.Y. 2014)

(noting that the "reputational harm in each of these cases [recognizing an injury in fact] was

asserted with some specificity"); e.g., Foretich, 351 F.3d at 1211 (involving affidavits averring

that Foretich suffered "harassment by the media, estrangement from his neighbors, and loss of

business and professional opportunities"); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638,

646 (2d Cir. 1998) (deeming allegations that "the exclusion of and related hostility toward ILGO

have divided and isolated ILGO from the rest of the Irish community" sufficient).  The lack of

any allegations of particularized harm beyond an insinuation that academic and non-profit

scientists may be biased or partisan is especially striking because the alleged reputational harm

here is not so readily self-evident that "[o]ne need not be a sage to recognize" it.  See Gully, 341

F.3d at 162.  Based on the NRDC's conclusory allegations as to a generalized, hypothetical

harm, this Court is not persuaded that its members have suffered reputational injury of the sort that courts deem cognizable.

    C.  <u>Loss of Professional Opportunity/Opportunity to Compete</u>

       As an initial matter, the EPA conceded at oral argument that the NRDC's members have sustained a constitutional injury to the extent they relinquished advisory committee membership or EPA grants.  (Oral Argument Tr., ECF No. 66, at 4-5.)  Specifically— and although neither the NRDC's original pleading nor its amended pleading allege standing on this theory—the NRDC submits declarations from several members attesting that EPA officials forced them to choose between continuing to serve on EPA advisory committees and retaining their EPA grants.  Consequently, these individuals curtailed the length of EPA-funded studies to maintain advisory committee membership or relinquished positions on advisory committees. (Declaration of Dr. Joel D. Kaufman, ECF No. 41 ("Kaufman Decl."), ¶¶ 12-13; Declaration of Dr. Jeremy Sarnat, ECF No. 42 ("Sarnat Decl."), ¶¶ 12-13; Declaration of Dr. Peter Adams, ECF No. 50 ("Adams Decl."), ¶¶ 13-15; Declaration of Dr. Charles T. Driscoll, Jr., ECF No. 51 ("Driscoll Decl."), ¶ 8.)

       Undoubtedly, the actual loss of either benefit may constitute an Article III injury. <u>Accord</u> <u>Physicians for Soc. Responsibility v. Wheeler</u>, --- F. Supp. 3d ---, 2019 WL 569448, at *4 (D.D.C. 2019) (finding the removal of a plaintiff from an advisory committee, thus "denying her a 'coveted and highly esteemed' position and the benefits that flow from it," to be cognizable).  Notwithstanding the EPA's concession, however, this Court has an "independent obligation to consider the presence or absence of subject matter jurisdiction <u>sua sponte</u>."  <u>In re</u> <u>Tronox Inc.</u>, 855 F.3d 84, 95 (2d Cir. 2017).  The Supreme Court has reiterated that Article III's "cases and controversies" restriction "requires that the party invoking federal jurisdiction have

standing—the 'personal interest that must exist <u>at the commencement of the litigation</u>.'"  <u>Davis</u>

<u>v. Fed. Elec. Comm'n</u>, 554 U.S. 724, 732 (2008) (emphasis added) (quoting <u>Friends of the Earth,</u>

<u>Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 189 (2000)).  In other words, standing

determinations are made by reference to the facts "at the time a suit was initially filed."

<u>Hargrave v. Vermont</u>, 340 F.3d 27, 34 n.7 (2d Cir. 2003); <u>accord</u> <u>Jones v. Schneiderman</u>, 101 F.

Supp. 3d 283, 292 (S.D.N.Y. 2015) ("Plaintiffs thus cannot rely on factual developments after

[the date on which they commenced the action] to establish standing."); <u>N.Y. Bankers Ass'n,</u>

<u>Inc. v. City of N.Y.</u>, 2014 WL 4435427, at *9, *10 (S.D.N.Y. Sept. 9, 2014) (reiterating the

"longstanding principle that the jurisdiction of the Court depends upon the state of things at the

time [] the action [is] brought" (alterations in <u>N.Y. Bankers</u>) (quoting <u>Keene Corp. v. United</u>

<u>States</u>, 508 U.S. 200, 207 (1993))).

   As relevant here, the NRDC's declarations indicate at most that its members lost

their professional opportunities or faced the imminent loss of those opportunities in March 2018,

after the NRDC commenced this action.  (<u>See</u> Kaufman Decl. ¶¶ 8, 12-13; Sarnat Decl. ¶ 12;

Adams Decl. ¶ 14; Driscoll Decl. ¶ 8.)  The facts in the declarations do not suggest that the

NRDC's members faced such loss or imminent loss when the NRDC filed this action in January

2018.  Importantly, and by way of comparison, at least one plaintiff in <u>Physicians</u> had allegedly

<u>already</u> been removed from an advisory committee when that lawsuit commenced—thus, it is

unsurprising that the <u>Physicians</u> court did not engage in a lengthy analysis on the existence of an

injury-in-fact.

   Although this Court concludes that the NRDC fails to establish standing based on

lost professional opportunities, it also considers whether the NRDC had standing at the outset of

this litigation based on its allegation that its members who are currently advisory committee

members would be precluded from competing for EPA grants, and that those who are current

recipients of EPA grants would be barred from the opportunity to seek appointment to an

advisory committee.  (Compl. ¶ 48.)  The EPA does not dispute that as a general matter, the loss

of an equal opportunity to compete for a benefit may give rise to a cognizable injury.  See

Mantena v. Johnson, 809 F.3d 721, 731 (2d Cir. 2015); accord CC Distribs., Inc. v. United

States, 883 F.2d 146, 150 (D.C. Cir. 1989) ("[A] plaintiff suffers a constitutionally cognizable

injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be

able to show that it was certain to receive that benefit had it been accorded the lost opportunity."

(emphasis removed)).  Thus, the NRDC is correct that it need not allege that its members

actually applied for and were denied an EPA grant or committee position—the injury itself is the

deprivation of an equal opportunity to compete.  See Planned Parenthood of N.Y.C., Inc. v. U.S.

Dep't of Health & Human Servs., 337 F. Supp. 3d 308, 320 (S.D.N.Y. 2018).

   But the NRDC's allegations that the Directive would hinder its members who

hold one benefit from competing for the other establishes only that its alleged injury is

sufficiently concrete.  Whether that harm is sufficiently imminent is a separate question, see

MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy, 861 F.3d 40, 46-47 (2d Cir. 2017), and

one that again requires this Court to look to the factual averments in the NRDC's declarations.

As a preliminary matter, the Supreme Court has "described the imminence requirement

differently in different contexts, without specifying whether the descriptions are synonymous or

distinct."  Knife Rights, Inc. v. Vance, 802 F.3d 377, 383 (2d Cir. 2015); see, e.g., Susan B.

Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice

if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will

occur.'" (quotation marks omitted)).  But in this context, the Second Circuit has stated that the

requirement of "imminent" or "certainly impending" harm in this context means that a plaintiff

must at least allege that it actually applied for a benefit or "very likely would have" applied for

the benefit but for defendant's conduct.  See MGM Resorts, 861 F.3d at 47; see also Planned

Parenthood, 337 F. Supp. 3d at 320.  Thus, for example, the Planned Parenthood court found that

Planned Parenthood had "asserted specific facts sufficient to support its contention that it 'very

likely would have bid' absent [the U.S. Department of Health and Human Services'] allegedly

unlawful actions" based on representations that it applies for grants in furtherance of its core

mission, that it has applied for the relevant grants "at every opportunity," and that it had taken

concrete exploratory steps to apply for a particular grant before ultimately deciding not to apply.

Planned Parenthood, 337 F. Supp. 3d at 320-21.

          This is not to say that Article III necessitates the showing made by Planned

Parenthood.  But "imminence" requires more than an interest in an undefined benefit or

opportunity at some point in the future.  See MGM Resorts, 861 F.3d at 47-48 (finding bare

allegations of interest in development opportunities and exploratory studies without any

"concrete plans to enter into a development agreement" or "serious attempts at negotiation" to be

insufficient).  Thus, that some of the NRDC's members may maintain a general interest in

pursuing EPA grants and serving on advisory committees—without more—does not satisfy the

"imminence" inquiry.  (See Schlesinger Decl. ¶ 10; Rosi-Marshall Decl. ¶ 9.)  Other members of

the NRDC state that they have previously served on committees or received EPA funding, and

that they may be deterred from applying for such opportunities in the future.  (Kaufman Decl.

¶¶ 6, 10; Sarnat Decl. ¶¶ 6, 9, 14; Adams Decl. ¶¶ 6, 16.)  Certainly, a party's past practice may

be probative as to the likelihood of future action, which "is concededly a somewhat elastic

concept."  See Lujan, 504 U.S. at 565 n.2.  But the factual record in this action yields a

meaningfully weaker inference that an NRDC member "very likely would have" applied for a future advisory committee position or EPA grant when the NRDC filed this action.  For instance, the NRDC's declarations do not identify any particular position or grant or specify any concrete action taken in furtherance of applying.  Nor do they suggest a similarly consistent historical practice of applying for such positions or grants, or even that certain members had applied for other governmental grants since the issuance of the Directive.

Although the "imminence" of an alleged injury lies on a spectrum that defies a binary categorization, it "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  Lujan, 504 U.S. at 565 n.2 (emphasis in original) (quotation marks omitted).  In this Court's view, these injuries to the NRDC's members are more akin to those in cases "where a supposedly potential bidder had 'no concrete plans' or 'no specific project.'"  Planned Parenthood, 337 F. Supp. 3d at 321 (quoting Warth, 422 U.S. at 516; MGM, 861 F.3d at 50); cf. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995) (finding standing where plaintiff made an "adequate showing that sometime in the relatively near future it will bid on another Government contract"); Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 659, 668 (1993) (finding allegations that petitioner's members "regularly bid on" contracts and that they "would have . . . bid on designated set aside contracts" to establish an "injury . . . of sufficient immediacy . . . to warrant judicial intervention" (citations and quotation marks omitted) (ellipses in original)).

## CONCLUSION

Article III standing is not a mere technical requirement—the "[r]elaxation of standing requirements is directly related to the expansion of judicial power."  United States v.

<u>Richardson</u>, 418 U.S. 166, 188 (1974) (Powell, J., concurring).  Ultimately, the Article III "standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  <u>Carter</u>, 822 F.3d at 56.  For the foregoing reasons, this Court determines that the NRDC did not.

        Accordingly, the EPA's motion to dismiss is granted, and the NRDC's claims are dismissed without prejudice.  <u>See</u> <u>Carter</u>, 822 F.3d at 56 ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice.").  The EPA and the NRDC's motions for summary judgment are denied as moot. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 31 and 33 and mark this case as closed.

Dated: March 21, 2019
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.